UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEVEN GOLDRICH,

                        Plaintiff,

      v.

WATKINS WELLNESS *and* WELLNESS
MARKETING CORPORATION, *d/b/a*
ENDLESS POOLS,

                      Defendants.

No. 22-CV-3769 (KMK)

OPINION & ORDER

---

Appearances:

Jordan Matthew Brooks, Esq.
Cuddy & Feder
Mt. Vernon, NY
*Counsel for Plaintiff*

Thomas V. Juneau, Jr., Esq.
Armstrong Teasdale LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Steven Goldrich ("Plaintiff") brings this Action against Watkins Wellness ("Watkins") and Wellness Marketing Corporation d/b/a Endless Pools ("Endless"; collectively, "Defendants") to recover losses related to his allegedly defective pool. (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 24).) Specifically, he raises five common-law claims for design defect, manufacturing defect, negligence, fraudulent concealment, and failure to warn. (*See id*. ¶¶ 61–109.) Before the Court is Defendants' Rule 12(b)(6) Motion to Dismiss. (Not. of Mot. (Dkt. No. 25).) For the foregoing reasons, the Motion is granted.

I.  Background

The Court assumes the Parties' familiarity with the facts and the procedural history of this case as described in *Goldrich v. Masco Corp.*, No. 22-CV-3769, 2023 WL 2649049 (S.D.N.Y. Mar. 27, 2023).  The Court will therefore recount only the background information necessary to resolve the instant Motion.

A.  Factual Background

The SAC is substantially similar to the First Amended Complaint ("FAC"), with the exception of a few new allegations.  (*Compare* SAC, *with* FAC (Dkt. No. 9).)  The core facts, however, remain the same.

Watkins Wellness—a California Corporation—manufactures "Endless Pools."  (SAC ¶¶ 9–11.)  Endless is a Delaware corporation with its principal place of business in Pennsylvania.  (*Id*. ¶ 12.)  While Plaintiff does not allege a specific relationship between the two entities, he states "[u]pon information and belief" that Endless may have been involved in designing Endless Pools, (*see id*. ¶ 20), and that it is responsible for installation, (*see id*. ¶¶ 21, 31, 43).

Endless Pools are not your garden-variety pools.  Beyond "standard pool features, such as pumps, a liner, steps, and a bench," Endless Pools "include a hydraulic motor, which helps produce a current, and an in-water treadmill."  (*Id*. ¶ 18.)  Plaintiff purchased one such pool (the "Pool") in 2012 for approximately $25,000.  (*Id*. ¶¶ 2, 19.)  He planned for the pool to be installed in a newly constructed house extension, fully recessed into the ground.  (*Id*. ¶ 35.)  But that process did not quite go as a planned.  Defendants' installers, who did not benefit from the involvement of Defendants' design professionals, did not account for high groundwater conditions, the size of the Pool room, and the need for service access.  (*Id*. ¶¶ 29, 32–33, 37.)

Years later, the Pool suffered two major incidents.  First, in July 2020, the Pool suffered an oil leak caused by a defective hydraulic sealant.  (*Id*. ¶ 38.)  The leak required the Pool to

2

"undergo a 'refurb,'" which involved draining the pool, installing new benches and lining, replumbing part of the Pool, and installing new hydraulic components. (*Id.* ¶ 39.) Second, less than two months after the refurb, the Pool "failed" and had to be repaired yet again. (*Id.* ¶ 48.) Specifically, the autocover brackets at the front of the Pool rusted, and one bracket collapsed, causing the Pool to "fail." (*Id.* ¶ 49.) To fix the Pool's frame and "ensure [it] did not collapse," Plaintiff acquired "new channel supports [and] cover brackets," a new "angle frame," and new "perforated stainless steel top covers." (*Id.* ¶¶ 50, 52.) The new top covers, although "not originally supplied as part of the Pool," were "required to ensure the Pool's proper operation and structural integrity." (*Id.* ¶ 53.) Plaintiff also incurred the "cost of tile work that needed to be performed around the Pool . . . to repair the Pool itself so that it could function." (*Id.* ¶ 54.)

Plaintiff alleges that Defendants knew about the underlying causes of these incidents but failed to tell him. Generally, he states that "Defendants direct their dealers not to inform customers that the pool's motor is likely to fail and the pool likely will need to be rebuilt within a few years of purchase." (*Id.* ¶ 42.) He also provides one specific example, alleging that, at a 2012 training, an Endless employee told Plaintiff's installer not to disclose "that the pool's motor would need to be replaced within six years of purchase." (*Id.* ¶ 43.) Finally, Plaintiff states that he relied on Defendants' "silence . . . as to not having to totally rebuild the Pool and that it would not near collapse in an indoor environment" in making his purchase. (*See id.* ¶ 101.)

Plaintiff seeks $45,000 in damages across the two incidents including: $16,363.17 for the refurb, (*id.* ¶ 41), $22,400 for structural repairs following the Pool's collapse, (*id.* ¶ 57), and $5,000 for tile work, (*id.* ¶¶ 73, 83).[1]

---

[1] At the very end of the SAC, Plaintiff requests a total of $50,000, excluding interest, costs, and fees, for two of his claims. (*See* SAC at 14.) It is unclear what accounts for the difference between this number and the earlier $45,000 figure.

3

B. Procedural History

The Court dismissed the FAC on March 27, 2023, and granted Plaintiff 30 days leave to file a second amended complaint. (Op. & Order (Dkt. No. 23).) Plaintiff filed the SAC on April 25, 2023. (Dkt. No. 24.) Defendants moved to dismiss a second time on May 9, 2023, (*see* Not. of Mot.; Defs' Mem. of Law in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 25-1)), and Plaintiff filed his opposition on May 23, 2023, (Mem. of Law in Opp. ("Pl's Mem.") (Dkt. No. 26).)[2]

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id*. at 563, and a plaintiff must allege "only enough facts to state a

---

[2] Defendants failed to comply with § II.A. of this Court's Individual Rules, which requires a pre-motion conference before filing a motion in a civil case. "Nevertheless, rather than delay these proceedings further by returning Defendant[s'] [M]otion and directing counsel . . . to submit a motion that complies with this Court's Individual Rules," the Court considers the instant Motion in the interest of efficiency. *See United States v. Nova-Nunez*, No. 96-CR-599, 1997 WL 30965, at *2 (S.D.N.Y. Jan. 24, 1997).

4

claim to relief that is plausible on its face," *id*. at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id*.; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id*. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Division 1181 Amalgamated Transit Union-New York Employees Pension Fund v. New York City Department of Education*, 9 F.4th 91, 95 (2d Cir. 2021) (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

Finally, fraud claims—including common law fraud claims—are subject to the heightened pleading standard set forth in Rule 9(b). *See Matana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013) ("[A] claim for common law fraud under New York law must satisfy the

5

requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b)." (collecting cases)). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations," rather "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52, (2d Cir. 1995)). "An inference is 'strong' if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Pilkington N. Am. Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015)).

B.  Tort Claims

Defendants once again argue that Plaintiff's design defect, manufacturing defect, negligence, and failure to warn claims are barred by the economic loss rule. (Defs' Mem. 3–4.) The Court agrees.

1.  Economic Loss Rule

"New York applies the economic loss doctrine to [tort] claims." *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 590 (S.D.N.Y. 2022). That rule "stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer . . . ." *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 220 N.E.3d 646, 656 (N.Y. 2023) (quoting *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia*

*Center, Inc.*, 750 N.E.2d 1097, 1101 n.1 (N.Y. 2001)).³  "Economic loss" here refers to "losses [that] flow from damage to the property that is the subject of a contract," including "the cost of replacing or retrofitting the product." *126 Newton St., LLC v. Allbrand Com. Windows & Doors, Inc.*, 993 N.Y.S.2d 558, 560 (App. Div. 2014) (quotation marks omitted).  The doctrine reflects the common-sense principle that "where [a] plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 297 (S.D.N.Y. 2022) (quoting *Dormitory Auth.*, 94 N.E.3d at 461); *see also Bocre Leasing Corp. v. Gen. Motors Corp. (Allison Gas Turbine Div.)*, 645 N.E.2d 1195, 1199 (N.Y. 1995) ("Given the reality of already existing, ample deterrents to manufacturers injecting unsafe products into the commerce stream . . . no tort recovery can be had against the manufacturer for contractually based economic loss, whether due to injury to the product itself or consequential losses flowing therefrom.").

---

³ The New York Court of Appeals recently clarified that the economic loss rule "does not have application beyond the products liability context." *IKB Int'l, S.A.*, 220 N.E.3d at 656. Outside that context, New York courts apply the closely related "prohibition against duplicative contract and tort claims." *Id*. (citing *532 Madison Ave. Gourmet Foods, Inc*, 750 N.E.2d at 1101 n.1).  That "well-established principle" provides "that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 460 (N.Y. 2018) (quotation marks omitted) (explaining that "merely charging a breach of a 'duty of due care,' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim" (quotation marks omitted) (alterations adopted)).
    The Parties do not dispute that the economic loss rule applies to Plaintiff's claims, which clearly fall in the "products liability" bucket.  The Court simply notes this recent development in New York law, as it resolved uncertainty among courts in this District.  *See IKB Int'l, S.A.*, 220 N.E.3d at 656 (citing several decisions that "appear to conflate [the] 'economic loss' rule with the prohibition against duplicative contract and tort claims"); *see also, e.g.*, *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 158 (S.D.N.Y. 2018) (noting the previous "inconsistent patchwork of state and federal decisions applying two related but distinct principles" in this context).

7

A plaintiff may still recover, however, "where physical injury occurs or damage results to *other* property due to a faulty product." *Cincinnati Ins. Co. v. Emerson Climate Techs., Inc.*, 187 N.Y.S.3d 391, 393 (App. Div. 2023) (emphasis added) (citations omitted); *see also Landtek Grp., Inc. v. N. Am. Specialty Flooring, Inc.*, No. 14-CV-1095, 2016 WL 11264722, at *18 (E.D.N.Y. Aug. 12, 2016) ("[W]here the allegedly defective product causes damage to 'other property,' recovery in tort is not automatically barred by the rule."), *report and recommendation adopted*, 2016 WL 8671839 (E.D.N.Y. Sept. 16, 2016). For the "other property" exception to apply, the damaged item must be truly separate; "recovery for damage caused to a unit or system by a defective component has been consistently barred by the economic loss rule." *See Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 365 (W.D.N.Y. 2013); *see also Landtek Grp.*, 2016 WL 11264722, at *18 (collecting cases and explaining that the economic loss rule bars recovery for "damage caused to a unit or system by a defective component . . . even where that component is manufactured by a third party" (quotation marks omitted)); *see also Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 309, 312 (S.D.N.Y. 2007) (holding defective switch, which formed an "integrated unit" with a water chiller, did not damage "other property" when it caused the chiller to malfunction); *Atlas Air, Inc. v. General Elec. Co.*, 791 N.Y.S.2d 620, 621 (App. Div. 2005) (barring recovery for damage to an entire plane as a result of the defendant's defectively designed engine).

  2. Claimed Damages

The SAC seeks recovery for three categories of losses: (1) the cost of "rebuil[ding]" the pool after the oil leak, including installing new benches, liner, hydraulic components, and plumbing, (SAC ¶¶ 39–40); (2) the cost of fixing structural components after the 2020 pool failure, including "channel supports, cover brackets, [an] angle frame, and perforated stainless

steel top covers," (*id*. ¶¶ 49–50); and (3) the cost of "tile work" performed around the pool "so that it could function," (*id*. ¶ 83).

Plaintiff does not put up much of a fight as to the first category. Indeed, the economic loss rule plainly bars tort recovery for the cost of "repair[ing] or replace[ing] the [defective] product," which describes the refurb Plaintiff undertook after the oil leak. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 457 F. Supp. 2d 298, 317 (S.D.N.Y. 2006); *see also Rothberg v. Phil''s Main Roofing, LLC*, No. 14-CV-10195, 2017 WL 1162904, at *9 (S.D.N.Y. Mar. 24, 2017) (holding cost to "repair and replace[]" defective roof was an economic loss); *Feliciano v. Gen. Motors LLC*, No. 14-CV-6374, 2016 WL 9344120, at *14 (S.D.N.Y. Mar. 31, 2016) (holding economic loss rule barred recovery of expenses "incurred to repair [a defective] vehicle"). To the extent the refurb involved work beyond mere repair, Plaintiff states this work was "necessitated by the Pool's myriad problems," (*see* SAC ¶ 7), meaning any associated costs "flow[ed] from damage to the property that is the subject of the contract." *See Goldrich*, 2023 WL 2649049, at *8.

Plaintiff argues, however, that the costs of structural components and tile work around the pool—categories (2) and (3)—fall within the "other property" exception. (Pl's Mem. 3.) Plaintiff finds support for that argument in *126 Newton St.*, where "windows and doors" were held to be independent of "other structural elements of the building, such as flooring and walls" for purposes of the economic loss rule. *See 126 Newton St., LLC*, 993 N.Y.S.2d at 561 (holding water damage to floor caused by defective window "constitute[d] damage to 'other property'"). But the caselaw is not as clear as Plaintiff makes it out to be. Other cases hold that where "building products [fail] to perform properly, the economic loss rule bars recovery for both the direct loss of the product [] *as well as* the consequential damages to the underlying structure."

9

*See Bristol Village*, 916 F. Supp. 2d at 366 (emphasis added) (citing *Weiss v. Polymer Plastics Corp.*, 802 N.Y.S.2d 174, 176 (App. Div. 2005) (holding economic loss rule barred recovery for damage to plywood resulting from defective stucco siding)); *see also Hemming v. Certinteed Corp.*, 468 N.Y.S.2d 789, 790 (App. Div. 1983) (barring recovery for "consequential damages to [] homes" caused by defective siding and explaining that "when damage suffered by a plaintiff is the result of a nonaccidental cause, such as deterioration or breakdown of the product itself, the injury is properly characterized as 'economic loss'"). The relevant distinction is not structural versus non-structural but instead whether the loss results from the product failing to perform as intended. Where a party contracts to buy a product for a certain purpose and suffers a loss from its failure to perform that purpose, the claim lies in contract, not tort. The plaintiff in that situation "seeks only to be returned to the point at which the breach arose and to be placed in as good a position as it would have been" had the product performed as intended. *See Hotel 57 L.L.C. v. Integral Contracting Inc.*, No. 22-CV-2554, 2023 WL 6390529, at *4 (S.D.N.Y. Oct. 2, 2023) (holding such damages constitute economic losses). By contrast, if a product performs properly but causes economic injury anyway, tort recovery is permissible. *See Bristol Village*, 916 F. Supp. 2d at 366 (explaining economic loss rule applies where the "damage claimed relates to the expectations of the parties"); *see also Praxair, Inc. v. Gen. Insulation Co.*, 611 F. Supp. 2d 318, 321 (W.D.N.Y. 2009) (allowing tort action where insulation performed its function of maintaining temperature but caused severe acid damage to surrounding pipes).

As to the structural components, Plaintiff's allegations are insufficient for two reasons. First, he does not adequately allege that these components are "separate" from the pool. Instead, he repeatedly states that the frame and supports were necessary to "ensure the Pool did not collapse" and that they "were required to ensure the Pool's proper operation." (SAC ¶¶ 50–53.)

The SAC accordingly reflects that these structural supports are parts of an integrated unit, each component of which is "required" for the pool to function. (*Id*. ¶¶ 53, 74, 75.) Second, the alleged structural damage—and need for replacement parts—is linked to the pool's failure to perform properly. Indeed, the SAC alleges that the pool had "multiple design defects" that "preclude[ed] its use" and alleges that those defects caused the pool frame to rust and ultimately "fail[]." (*Id*. ¶¶ 48–49.) Similarly, Plaintiff states that he needed to install new perforated covers to "ensure the Pool's proper operation and structural integrity." (Pl's Mem. 3.) It is of course *possible* to infer that the pool worked and caused structural damage via some other mechanism. But there is an "obvious alternative explanation," *see Iqbal*, 556 U.S. at 682, which is that the pool failed to function as intended and leaked, causing its collapse. That alternative is consistent with Plaintiff's multiple allegations that he could not "use" the pool. (*See* SAC ¶ 48.) And Plaintiff makes no effort to explain why these loses are *not* a consequence of the pool's failure to match expectations. *See Bristol Village*, 916 F. Supp. 2d at 366 (dismissing claim where the plaintiff offered "no supporting argument explaining how the [alleged] moisture damage . . . [was] not a direct result of [the defective product's] failure to appropriately perform as part of the building's protective exterior").

Although the perforated covers may not have been "part" of the original pool, it is not enough to simply allege that something is "separate and physically distinct" from the damaged product. *See Trump Int'l Hotel & Tower*, 524 F. Supp. 2d at 309. If that component is part of a retrofit and is required for a product to perform properly, its cost "result[s] from the failure or malfunction of a product." *Manhattanville Coll. v. James John Romeo Consulting Eng'r, P.C.*, 813 N.Y.S.2d 767, 770 (App. Div. 2006) (explaining economic loss rule applies to "retrofitting" costs). "A contrary view would result in an over-parsing of most modern mechanical devices"

11

and would unduly expand "tort law into an area traditionally reserved for contract and warranty." *See Trump Int'l Hotel & Tower*, 524 F. Supp. 2d at 312.

Defendants acknowledge that the cost of new tiles is a borderline case but believe the SAC does not establish that cost is damage to other property. (Defs' Mem. 4.) The Court agrees. Intuitively, the tile "around" the pool seems to be "other property" in that it is separate from the pool itself. Yet, the SAC does not allege any damage to the tile because of the pool's failure. (*See generally* SAC.) Instead, the only tile-related allegations are that Plaintiff had to "incur the cost of tile work that needed to be performed around the Pool *in order to repair the pool itself*." (*See id*. ¶ 54 (emphasis added); *see also id*. ¶¶ 73, 75, 83, 85 (similar).) While the Court appreciates Plaintiff's candor, the SAC expressly states that this tile work is a repair to the allegedly defective pool, which means the associated $5,000 is an "economic loss." *See Cayuga Harvester, Inc. v. Allis-Chalmers Corp*., 465 N.Y.S.2d 606, 620 (App. Div. 1983) (disallowing recovery for the "cost of repairs to put the [product] into reasonably operable condition"); *see also Amin Realty, LLC v. K & R Const. Corp*., 762 N.Y.S.2d 92, 93 (App. Div. 2003) (holding cost of "the removal, re-installation, and repair" of building floor necessitated by defective concrete was an economic loss); *cf. E. River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 873 (1986) (applying federal common law economic loss rule and explaining that "[r]ecovery on a warranty theory would give the [plaintiffs] their repair costs . . ., and would place them in the position they would have been in had the turbines functioned properly").

Accordingly, the Court determines that the damages claimed in Plaintiff's first, second, third, and fifth causes of action constitute "economic losses" for which he may not recover.

C.  Fraudulent Concealment

Next, Defendants argue that Plaintiff has failed to adequately plead reliance, as required to state a fraudulent concealment claim. (Defs' Mem. 5–6.) "Under New York law, a claim for

fraudulent concealment requires a plaintiff to establish '(1) that the defendant had a duty to disclose certain material information but failed to do so; (2) that the defendant then made a material misrepresentation of fact; (3) that said misrepresentation was made intentionally in order to defraud or mislead; (4) that the plaintiff reasonably relied on said misrepresentation; and (5) that the plaintiff suffered damage as a result.'" *Clark v. N.Y.C. Housing Authority*, No. 20-CV-251, 2022 WL 4229386, at *7 (S.D.N.Y. Sept. 14, 2022) (quoting *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 30 (App. Div. 2012)). And as the Court previously explained, to adequately plead fraud, plaintiffs must also meet the particularity requirement of Federal Rule of Civil Procedure 9(b), which "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015); *see also Reyes v. Upfield US Inc.*, --- F. Supp. 3d ---, 2023 WL 6276685, at *11 (S.D.N.Y. Sept. 26, 2023) (same).

"Although the Second Circuit has not yet determined whether Rule 9(b)'s heightened pleading requirement applies to allegations of reliance in connection with a common law fraud claim," district courts in the Second Circuit have concluded that a plaintiff "must allege with particularity that it actually relied upon [the defendant's] supposed misstatements." *Olson v. Major League Baseball*, 447 F. Supp. 3d 159, 167 (S.D.N.Y. 2020) (quotation marks and citation omitted), *aff'd*, 29 F.4th 59 (2d Cir. 2022); *see also Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 291 (S.D.N.Y. 2019) (same); *Gotham Diversified Neutral Master Fund, LP v. Chicago Bridge & Iron Co. N.V.*, No. 18-CV-9927, 2019 WL 3996519, at *4 (S.D.N.Y. Aug. 23, 2019) (same); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 463 n.16

(S.D.N.Y. 2018) (collecting cases) (citing *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 995 F.Supp.2d 291, 312 (S.D.N.Y. 2014) ("To plead common law fraud, a plaintiff must allege with particularity that it actually relied upon the supposed misstatements."), *aff'd*, 829 F.3d 173 (2d Cir. 2016)); *cf. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Companies L.L.C.*, 829 F.3d 173, 177 n.4 (2d Cir. 2016) (declining to consider whether Rule 9(b) applies to reliance allegations in common law fraud cases).  The Court agrees with that view as "Rule 9(b) states unequivocally that 'a party must state with particularity the circumstances constituting fraud,' and reliance has been an essential element of what constitutes fraud from the earliest days of the common law."  *See Olson*, 447 F. Supp. 3d at 167 (quoting Fed. R. Civ. P. 9(b)).

The Court recognizes that Plaintiff alleges material information that Defendants supposedly failed to disclose.  He states that Endless' manager instructed Plaintiff's installer that "the pool's motor would need to be replaced within six years of purchase" and that installers were not to disclose this information to customers.  (SAC ¶ 43; *see also id*. ¶ 94 (similar).)  As to reliance, however, Plaintiff alleges only that he "reasonably relied on the silence of Defendants . . . as to not having to [1] totally rebuild the Pool and [2] that it would not near collapse in an indoor environment."  (*Id*. ¶ 101.)[4]

This allegation is insufficient.  As Defendants point out, there is a mismatch between the SAC's concealment and reliance allegations.  (*See* Defs' Mem. 5.)  On the one hand, Plaintiff pleads specific material omissions about replacing the motor, yet he alleges reliance on omissions regarding "totally rebuild[ing]" the pool and its integrity indoors.  (*See* SAC ¶ 101.)

---

[4] Later in the SAC, Plaintiff states generally that: "Had Defendants provided the required warnings of the Pool's latent defects and dangers, [Plaintiff] would not have purchased the Pool and suffered the damages complained of in this [SAC]."  (SAC ¶ 108.)

Beyond a general allegation that "Defendants did not inform [Plaintiff] that the Pool . . . would need to be rebuilt within a few years of purchase," (*id*. at ¶ 98), Plaintiff provides no detail about the basis for those latter omissions, nor does he "alleg[e] that [Defendants] made the [omissions] with knowledge of their falsehood." *See Baldeo v. Airbnb, Inc*., No. 20-CV-7771, 2023 WL 7689652, at *9 (S.D.N.Y. Sept. 29, 2023). Of course, Plaintiff need not "specify the time and place" of each misstatement, especially in cases like this where "no affirmative act occurred." *See Oden v. Bos. Sci. Corp*., 330 F. Supp. 3d 877, 899 (E.D.N.Y. 2018) (quoting *Woods v. Maytag Co.*, 807 F.Supp.2d 112, 119 (E.D.N.Y. 2011)), *adhered to on reconsideration*, No. 18-CV-0334, 2019 WL 1118052 (E.D.N.Y. Mar. 11, 2019). But he "must still allege . . . the person responsible for the failure to disclose . . . [,] the context of the omissions[,] and the manner in which they mislead [him]." *Id*. Plaintiff has not done any of these things for the "rebuild[ing]" and "indoor environment" omissions and thus has not alleged reliance on an actionable misrepresentation.

      To bridge the gap, Plaintiff essentially argues, via a parenthetical allegation, that it is possible to infer the broader "rebuilding" omission from his specific "motor" allegation. (*See* Pl's Opp. 4 ("Defendants omitted . . . the material facts that the Pool's motor would likely fail (*and hence the Pool would need to be rebuilt within a few years of purchase*)." (emphasis in original) (quoting SAC ¶ 94).) Ironically, that parenthetical emphasizes what Plaintiff could not state expressly: that a specific Defendant knowingly omitted information about having to rebuild the pool. Plaintiff's failure to explain *why* his inference is appropriate in the SAC deepens the problem. Rule 9(b) requires specific allegations about the "manner in which [the omissions] [were] misle[ading]," *Woods*, 807 F. Supp. 2d at 119, to avoid situations like this where the Court and Defendants are left guessing about the precise grounds for fraud, *see United States ex*

15

*rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (explaining Rule 9(b) is designed to provide "fair notice" to defendants). Plaintiff's approach would allow parties to circumvent those particularity requirements by pleading a single specific allegation and using it as a springboard to speculate about other information Defendants may have also concealed. And even were the Court to accept Plaintiff's bootstrapped allegation that "Defendants omitted . . . [that] the pool would need to be rebuilt," (*see* SAC ¶ 94), Plaintiff *still* "fails to identify which Defendant, or which combination of Defendants" omitted this information. *See Goldrich*, 2023 WL 2649049, at *9 (citing *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 213 (S.D.N.Y. 2019) ("[S]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)." (quotation marks omitted))); *see also Demirovic v. Ortega*, No. 15-CV-327, 2016 WL 11472745, at *11 (E.D.N.Y. Sept. 15, 2016) ("Courts have repeatedly dismissed claims pursuant to Rule 9(b) in similar situations where a pleading fails to identify the roles of each participant in a fraudulent scheme."), *aff'd*, 771 F. App'x 111 (2d Cir. 2019) (summary order); *U.S. ex rel. Mooney v. Americare, Inc.*, No. 06-CV-1806, 2013 WL 1346022, at *4 (E.D.N.Y. Apr. 3, 2013) (holding a plaintiff did not satisfy Rule 9(b) where he "[did] not identify what specific roles [each defendant] played or what false claims they [made]").

### III.  Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted. Plaintiff has already amended his Complaint twice, once after being put on notice of its deficiencies. *See Goldrich*, 2023 WL 2649049, at *10 (rendering "the first adjudication of Plaintiff's claims on the merits"). "To grant Plaintiff[] leave to amend would be allowing [him] a 'third bite at the apple,' which courts in this district routinely deny." *Binn v. Bernstein*, No. 19-CV-6122, 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) (collecting cases), *report and recommendation*

16

*adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020); *see also Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 574 n.28 (S.D.N.Y. 2016) ("[T]he [c]ourt has given [p]laintiff two bites at the apple, and there is no need for a third bite."); *cf. Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration adopted) (footnote and quotation marks omitted)).  Plaintiff's claims are therefore dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the pending motion flag, (Dkt. No. 25), and to close the case.

SO ORDERED.

Dated:   March 20, 2024
         White Plains, New York

---
KENNETH M. KARAS
United States District Judge